Is there any need to answer a question of the Daniel Churchill et al. House around 2 o'clock, which is the name of Belshause family, or is there a second question? The purpose of a forcible entry action is to decide who has the right to possess certain property. And in this case, my client is a trustee of the Belshause family trust, and the defendant is Elaine Belshause, the widow of Marvin Belshause, who was the settlor of the trust. The property in question is a tract comprising about 36.7 acres in Milan, Illinois. The evidence is that in 2003, Marvin Belshause set up this trust and made himself as trustee with Mr. Churchill as successor trustee upon Marvin's death. After Marvin died, Mr. Churchill became the owner of the property, and around that time, the defendant moved into the Milan property. She had been living in the Marigold Residence in Oregon, but decided to move to Milan. The trustee subsequently asked her to sign a lease to pay the expenses of the property and other leasehold agreements, and there were some negotiations. They did not resolve in a lease. They did not come to terms, and so the trustee as owner gave notice and then filed a forcible entry action. At trial, the plaintiff showed that, in fact, it was conceded by the defendant that the trustee was the owner of the property and that there was no agreement of any kind giving the defendant the right to possess the property. We believe on this evidence that possession should have been awarded to the plaintiff. However, instead of deciding on that evidence, the trial judge allowed extraneous evidence to come in and looked at the Belshause family trust and construed or interpreted that to give the defendant a life estate in the trust property in Milan. She's the income beneficiary, though, isn't she? She's the income beneficiary. That's correct, Your Honor. And so, in effect, if she were to pay rent for the property of which she's the income beneficiary, then she'd have to turn around and pay income tax on that because that would be considered income to the trust. Well, not exactly. If the overall trust for the year had a net positive income, yes, she would receive that income and would have to pay tax on it. Does the family trust use the word net or use the word all? It may use the word all, but I believe that the case law says that that's net, so however you want to parse that. Was Elaine paying taxes and insurance on the Milan property when the eviction proceedings began? Absolutely not. She's never paid one penny of taxes or insurance on this property since she moved in in August, or I'm sorry, after her husband's death in August of 2008. Did Judge Conklin find, though, that the Milan residents had become the marital residents? I don't think he made that finding, and it would be hard for him to make that finding because it was not, in fact, the marital residents. The evidence was that Judge, or I should say it was unclear. My client testified that he found that Elaine had moved into the property in November. Her husband died in August. Judge Conklin said to Elaine, asked her, when after your husband's death did you move into the property? And he sort of pressed that question, and she kept debating and finally said, I don't remember how long after the death. So it was never the marital residents in the sense that they lived there together. If Judge Conklin did make that finding, are we bound by that finding, unless it's contrary to the manifest way to the evidence? I don't think that finding has any bearing on this case whatsoever, even if it would have been the marital residents. It doesn't change the terms of the trust, and the trust gives the trust property to the trustee to deal with as the trustee sees fit. Did Marvin ever live in this house? Not according to the evidence that was presented. There was evidence presented that Marvin and Elaine were planning to move to the Milan residence from Orion. But there was no evidence that Marvin moved to that property. He had put property that he had inherited from his family into this Bell House family trust. His residence in Orion, the marital residence where he and Elaine had lived, was in a different trust, the Marvin Bell House trust. Both of those trusts were written together, but they had different provisions. And that's what I think Judge Conklin was trying to do, was trying to somehow read some of the terms of the Marvin Bell House trust into the Bell House family trust. There are two different trusts with two different sets of terms. In fact, didn't the couple communicate to Mr. Churchill that they intended to move into the Milan residence? That's correct. And he didn't object? Well, no. They were married. Marvin was the trustee of the trust. Marvin had the right to do with the trust property whatever he wanted to do. Mr. Churchill had no right to object to what Marvin did with the property. It was only after Marvin died, Mr. Churchill became the trustee and owner of the property, that he then began talking about signing the lease with Elaine. And they tried to negotiate something. So there was no lease that Marvin required for them to move into then? Well, no. Marvin as trustee could do with his property whatever he wanted to. And yes, he and his wife could have lived there without a lease or whatever. I don't think that would be any sort of a problem with him as trustee. He could deal with the trust property as he saw fit. Is the Orion House still owned by the Bell House family trust? No. The provisions, and we mentioned this in our brief, the provision of the Marvin Bell House trust, although it did have a right of Elaine to live in that property, the fact was that if Elaine outlived Marvin, she actually got that property outright. So upon his death, she got the Orion property free and clear. To your knowledge, does she still own it? I have no idea. You don't know. Okay. I think so, but I really don't know for certain. And I don't think that was brought up at the trial. As I say, over our objection, the court let in this evidence about the Marvin Bell House trust, information about the failed lease negotiations and what Elaine said she was offering to do but had never done, and arguments about the taxability of income from the trust. We believe that the Bell House trust itself is unambiguous. It says that the trustee may make leases or take any other action with respect to real or tangible property that an individual owner could take. So there's no, and there's nothing in the Bell House family trust giving Elaine any right to live in the property or to control the use of that property. She has the right to the income from the trust but not to the use of the property. There's another home on the 36 acres. Were there eviction proceedings for the tenants of that home as well? Actually, as I understand it, there was some rent being paid by the other people who were living in that other home, like $100 a month or something like that. Was that then paid to Elaine as income? The net income of the trust was paid to Elaine. Has Elaine ever received any income from this trust? I believe she may have, but I'm not really sure. She would have the right, if the trust had net income for the year, she would have the right to that income. And if there was net income, then she would have received it. I don't know if there has been net income. And wouldn't Mr. Churchill's right as a trustee be subject to his fiduciary obligation to her as the income beneficiary of the trust during her lifetime? You say he has the right to do anything with it, and in a sense that's true, but she does have rights as an income beneficiary. Well, he has no question. He has fiduciary obligations as trustee to manage the trust property appropriately and to pay the income to the life income beneficiary, but he also has obligations to manage the property for the benefit of the remainder beneficiaries who will be entitled to the property after Elaine passes on it. So I think that's the tension here between the rights of the life income beneficiary and the rights of the remainder beneficiaries. There's a little bit of tension, too, between how Mr. Churchill's fees are calculated, and that's at 1% of the trust assets. Correct. So when he testified that the cost of running the trust was $24,000, he testified that $9,000 was for taxes, $6,000 was for his fees, $5,000 was for depreciation, and the trust instrument doesn't allow depreciation until the assets, the value of the liquid assets, no longer are sufficient to cover the administration of the trust. Okay. I agree with all that, but I still don't see how that has anything to do with who is entitled to possession of the property. I have a concern that Mr. Churchill, as trustee, may be protecting the residual beneficiaries, but also he has kind of a benefit himself by keeping the trust assets, not reducing them to pay insurance. Well, I suppose any trustee that charges a fee has an interest in the trust producing income to pay the trustee's fee. That's correct. But his fee is not tied to income. His fee is tied to the value of the assets. Right, and I believe that that's the way that trustees normally, I think 1% of the value held under trust would be shown to be a typical trustee's fee. So he set the rent to wash out with the trust expenses as he viewed them. Thereby, Elaine wouldn't receive any income. Well, one of our objections was that the court got into these negotiations by the parties. We think what's relevant here is that the parties didn't come to an agreement, not what their respective positions were with regard to the failed lease negotiations. So whether he was asking, quote, too much or whatever, I don't really see how that bears on whether he has a right to possess the property. If he has no right to possess the property, he has no right to any payment at all, and that's what Judge Conklin has established here, is that Elaine gets to live at the property, has to pay nothing at all, ever, for the rest of her life. So, and we can't, if this ruling stands, Mr. Churchill can't come in next year and say, well, taxes went up and we want some money, because there's already a ruling that she's entitled to a rent-free life estate, and that's why we're here. We think the trust itself is unambiguous, that there was no need for bringing in all this extrinsic evidence to try to construe the terms of the trust, and that the court sort of got sidetracked by all these other things that got brought in. As I say, the other side, then, the appellee brings in, the defendant brings in some of these other things that Mr. Churchill didn't object to them moving into the property when he wasn't the trustee, and even after he didn't immediately tell her to move out of the house, he tried to make arrangements so that she could live there, if she would pay an appropriate sign and an appropriate lease for the property. We basically object to the fact that the court conflated the terms of the Marvin Bell House Trust with the terms of the Bell House Family Trust. They're two separate trusts, they deal with different property, and their terms are different. One other thing I'd like to touch on, they talked in their brief, they brought up for the first time the concept of latches. Latches is an unreasonable delay to the detriment of one of the parties. In this case, there was no unreasonable delay, and certainly no detriment to Elaine by being able to live in the property, now going on over a year and a half, going on two years, no, more than two years since she moved in. In conclusion, the plaintiff showed that he is the owner of the property, that there's no agreement or other provision in the trust or other document giving Elaine a right to live in this property or control this property, and with those facts, judgment should have been entered for the plaintiff. Thank you. Thank you, Mr. Park. Mr. Pepping. Thank you, Your Honor. Good morning. Honorable Justices, Counsel, and members of the Court, I represent Elaine Bell House, the income beneficiary of the trust in question, the Family Trust. I thought I would start out with covering the issue of the standard of review. For issues of law, such as construing an unambiguous trust agreement, that would be de novo. For an issue, however, that the trust is silent on, this particular trust is silent on the issue of whether rent should be charged to the income beneficiary. In that situation, the standard of review would be the manifest weight of the evidence. Looking at the evidence that was presented, is an opposite conclusion obviously apparent, or do the trial court's findings appear to be unreasonable, arbitrary, or not based on the evidence? I think the trial court correctly allowed extrinsic evidence in on the issue of what the intent of the grantor was and whether the parties had any prior understandings or agreement to determine whether or not rent should be charged in this case. Also, a comment was made by counsel in the brief as well as during argument that he felt that there were things that were admitted into evidence, particularly on the offer that Elaine Bell House made to pay all the expenses direct and not pay rent, and that shouldn't have been allowed. That particular question was asked and answered before any objection was raised. So Mr. Churchill answered that question before any objection was raised, so that should be weighed. One of the key issues in this case is what was the intent of the grantor, Marvin Bell House. And we have several things to look at there. This is all circumstantial evidence because the family trust itself doesn't say whether rent should be charged. The first thing is on the very day that he signed the family trust, he signed another trust. That other trust actually had the house that they were living in in it at the time that it was signed back in May of 2003. And in that trust he said that I don't want my spouse ever to have to pay rent on the marital residence. The marital residence changed shortly before death. And when the parties moved into the property, the testimony in the record, even though Elaine Bell House couldn't pin down an exact date, it's very clear that they had moved into the new property in the family trust by what was said in the record. She said that all of the furniture, beds, TVs, washer and dryer, everything they needed to live had been moved into the family trust property in Milan before Marvin died. And they had, over a period of months, had several conversations with Mr. Churchill about this. So certainly in terms of the Lachey's argument, there was prejudice. They had to go to a lot of work to move all this stuff over there. So just looking at that evidence in the record, one would have to conclude that when she said we couldn't live in the Orion property anymore, they lived in the Milan property before death. What's the evidence that Mr. Bell House lived in that property? All of his things were moved into it also. I'm not sure, this isn't in the record, but I'm not sure that he ever slept a night in that house. There's nothing in the record to say that. He may have been too ill to sleep anywhere. But clearly he did not reside anymore at the Orion property. They had moved all of his furniture and all of her furniture to the new residence. Were you relying on the trial court using the provision from the family trust as the standard for the other trust? In part, I think that's true. I mean, that's a clear indication of his intent. And in some situations, I think that could be overcome. So let's say that under the terms of the family trust, Elaine Bell House was not the life tenant and allowed the income. The eight children of Marvin and Elaine are the residuary beneficiaries. It's a little different there from the living trust. But because she is the income beneficiary and any rent that she paid would come back to her anyway, under the terms of the family trust, if we construe what his intent was, especially in light of the fact he signed something saying pay no rent for my house, I think the intent is pretty clear. And just simple logic indicates that as well. The other thing that indicates that the intent was not to charge rent is normally if you have a tenant, you don't let them move anything in the property until they sign a lease and they pay rent. In this case, that never happened. And after the trustee changed on August 24, 2008, when Marvin Bell House died, Mr. Churchill never came out and said, I want you to pay rent, not until 2010. You know, I think it was like January, late January of 2010 that he first sent out a letter asking for rent. And then the demand for possession wasn't until March 31, 2010, more than 18 months after death. So looking at the circumstantial evidence in question, I think all of that reflects on whether or not there was an intent to charge rent. A normal landlord would have raised that issue a year and a half earlier. In this situation, during those conversations with Mr. Churchill beforehand, there was never any suggestion about that. Contrary to Mr. Park's argument, Elaine did not concede that there was no agreement for possession. She just indicated she didn't enter into any agreement directly with Mr. Churchill. That's what the question was that was asked of her. And I think there is an implied agreement based upon the facts that existed in the summer of 2008 when Marvin was living that she not be charged rent, based on the conduct of the parties and what happened. And I think the actual document that was signed in May of 2003 saying don't charge rent is also a factor that was correctly considered by the court. The other thing is just the relationship of the parties. Normally, this is a first marriage, it's not a second marriage or anything. Normally a husband would not charge a wife rent to live in a home. So I think all these things support the conclusion. And under forcible entry and detainer law, the burden of proof rests with the plaintiff, the party seeking to change possession. And the presumption is that possession by the defendant is lawful. And so I don't think they met that burden of proof. Argument was made that it's speculative to presume rental income is taxable. That's not at all speculative. Rental income by matter of law is, in fact, taxable. In the situation here where Elaine agrees to pay all the expenses of the trust, any rent that she would pay would, in fact, result in... She's not agreeing to pay the expenses of the trust. She was agreeing to pay the expenses associated with her tenancy on the property. Correct, Your Honor. I misspoke. I apologize. That is absolutely correct, yes. So she was agreeing to pay all the expenses relating to this property when he sought to get possession. Really, the only expense that doesn't relate to the property is fees? Right, right. So any other property should produce income to support its expenses. And in the record, there was evidence that the stocks and bonds and things that Mr. Churchill invested in produced more than enough income to pay his trustee fee unless the assets were to greatly appreciate and those rates declined or something. But at that time, he admitted that it was sufficient. There was an exhibit admitted for that purpose. The First National Bank of Chicago case that we cite says the court may consider surrounding circumstances at the time the trust was executed to aid in determining the settler's intent. And clearly, I think that the other trust has evidence that should have been considered and was considered. In this case, Mr. Churchill never had possession of the property. And he was also the one who actually did the drafting of these documents. So if there is any ambiguity, I think it should be construed against him. The rule of law is that a trial court's decision to admit evidence should be overturned only when no reasonable person could take the view adopted by the court. That was in the Spetzel case that we cited. I think the court correctly looked at all the facts and circumstances as the extrinsic proof of what the true intent was. The other thing that the trial court had the opportunity to do was to look at the demeanor of the witnesses and look at their credibility. Hence, we have the manifest weight standard. But in answering some of these questions, Mr. Churchill argued things that just splunked the smell test, that $225,000 of liquid assets aren't sufficient and I should get money piling up in the trust for depreciation. The issue of motive is a big issue here. What does the trust provide for in terms of depreciation? When that could be taken? In the language of the trust, this is at page 130 of the record, section 10.11, the only time that depreciation could be charged to the income beneficiary is if there were insufficient liquid assets available. That was the language that was used in the trust that Mr. Churchill himself drafted. Yet, he just said, I don't think $225,000 is sufficient. No argument why, just made that comment. My client wants to see the residual beneficiaries, her own children, made whole. She's proposed something that would not result in any loss to them for her occupancy of this property. But one of the things that should be considered is that Mr. Churchill has a duty, not just the duty of the work-a-day world, but a very high fiduciary duty to do what's in the best interest of the beneficiaries. And where she is the income beneficiary entitled to any income that would be charged on this property, to have her pay it in and then have taxable income come back to her would not be in her best interest. It doesn't take a rocket science to figure that out. And he did, in fact, have income that was taxable to her in the 2009 year. So you'd ask Mr. Park if she ever had to pay taxes. The answer is yes, and that's before paying any rent. So I think in this situation, if you look at what his duty is in this case, even without this extrinsic evidence, I believe that he would have breached his fiduciary duty by evicting her from the property. Now, the other issue that I didn't talk about in my brief, well, I talked about it in my brief, but I didn't have a chance to counter the cases cited by the defendant, because he argued that laches should not be considered because it wasn't pled. First thing is, in a forcible entry case, a defendant can establish proof without pleading of any defense legal or equitable that's germane to the case. And I would cite the Coyne v. South Shore Deluxe Laundry case, 299 Illap, 275, 20 Northeast 2nd, 117. That's a 1939 case. As well as the Samick v. Newman case, 164 Illap 3rd, 967, and that's 115 Illdeck. 897, that's a 1988 First District case. That Samick case involved a similar situation where a forcible entry action was brought and there was a will that was being construed. And the trial court was reversed for refusing to listen to defenses, saying there was no requirement of pleading those defenses under Section 9-106 of the Code of Civil Procedure. So I think laches is something that has to be looked at. She went to all this trouble of moving after talking a couple of times to Mr. Churchill, and now he wants her to move back out because he's got some idea she ought to pay rent to herself, essentially. And I think that's wrong. I think there's some evidence of improper motive that he got upset with her after she changed attorneys. And I think that it's time for the nonsense to stop. I hope that the court can find that the trial court correctly applied the evidence and uphold this verdict. You argued laches in the trial court? Yeah, I argued it in, I think, some of the argument later on. I don't know if I used the word laches, but I argued that, you know, about the conversations with Mr. Churchill and that he didn't object. And so I think, you know, that was argued in terms of the record. I don't think I actually used the word laches. I may have, but I don't recall using it. Are there any other questions? I guess I have a question on the net issue. If Elaine agreed to pay $2,000 a month, is it your understanding that the entire $2,000 has to come back through the revolving door to her? The actual language in the trust says income. It doesn't say net income. It says all income. All income, right. So I think it does. You know, Elaine really isn't looking for that. I understand. I mean, the amount she'd be taxed on wouldn't be the full $2,000 because we'd subtract the deductible expenses from it, like the insurance and taxes. But, you know, it would result in a greater tax impact on her. Thank you. Any other questions? Thank you, Mr. Peffing. Mr. Park, any rebuttal? I'll try to be brief, Your Honors. The standard of review for construing a trust is de novo. But in this case, we don't think that there's really a lot to construe about the trust. The trust is very clear, very plain, and there's nothing, there's no textual basis where Judge Conklin says, well, I don't really understand what this means and so I have to have all this other evidence come in. What we've done is the trial court took the circumstantial evidence, not circumstantial evidence that related to the execution of the trust, which is what the case just talked about. In other words, the trial court didn't look at what happened in 2003. The trial court looked at what had happened in 2008 to try to construe what the, quote, intent was in 2003, when the terms of the trust were absolutely clear. And where we have shown that the trust gives the trustee the power to control the property, that there is no contrary provision in the trust giving Elaine a right to control or reside in the property, that should be enough. And with regard to latches, all the moving, a lot of the moving was obviously done before Mr. Churchill even got into the picture. And so the idea that she's somehow been harmed by living in this property for two years, for a year and a half at the time of the trial, without paying any expenses or any rent, I don't see how they can turn that into a detriment. She's had that opportunity and it's certainly not been detrimental to her. We asked that the court look at the pertinent evidence, which is an absolutely clear trust agreement and nothing in the trust or in any other agreement giving her a right to possession. Under those circumstances, we believe that the plaintiff should have been awarded possession. Any other questions for Mr. Park? Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement.